24-30, 24-785 Daniel B. Ward. All right, we'll just wait until everyone is shuffled out. We're losing the audience. All right, Councilor Kiley, you've reserved two minutes for rebuttal, is that correct? Yes. All right, you may proceed when you're ready. Thank you. Good morning. Good morning. Oriana Kiley on behalf of Dr. Wars. I'm joined by my partner, William Nolan, on behalf of the appellant. May I please the court? The case that plaintiffs put forward at trial was one about preferred medication, which this court has repeatedly held is not actionable under 1983. And because the rescission of the policy at issue mooted any claim, any official capacity claim against my client, every possible path to liability against Dr. Wars thereafter failed. The plaintiffs had to prove that following the rescission of the MWOP policy, that there was an ongoing and system-wide basis of deliberate indifference. So, Councilor, it seems to me the district court made factual findings that the policy is de facto still in place. And if that's right, tell me if you disagree, but that's the essence of the district court's finding. Unless those are clearly erroneous, it seems like everything else follows. The mootness question, liability to upward from the individual providers and the like. So tell me at what point you disagree with that. Well, the findings that the lower court made are clearly erroneous, because when reviewing the record in its entirety, the facts overwhelmingly do not support plaintiff's claim. And I want you to return to that. But just analytically, if we disagree with that, that is to say if we think that that wasn't a clearly erroneous finding, do you have any additional arguments or is it really predicated on what you're about to walk us through, which is that that basic finding was clearly erroneous? It is that, coupled with the fact that the court continued to apply incorrect standards of liability against Dr. Morris. This was always a Monell claim, which the plaintiff expressly disclaimed. And if it wasn't- Look, they did all that. If you go back to the preliminary injunction, to all of that stuff, the district court muddled very badly. But once you came to the final thing, the final injunction, was it moot? Was there Monell? Was there enough? The court made quite clear findings of fact that this was so. And if that is so, why should we concern ourselves with anything before, but whether the district court was clearly erroneous in finding that this policy was still in effect and that your client was one of the people who was doing it? None of the findings made ever bridged the gap between the facts found and Dr. Morris as the official policymaker for DOCS. At no point was there evidence of culpability from the policymaker. And therefore, the facts only support an individual liability claim against the individual providers. That is the only case. If any case was proven, it was that. But that is not sufficient to find Dr. Morris liable for injunctive relief on a system-wide basis. That's what you said. Go on. Once the MWOP policy was rescinded and replaced with 1.24a- and the question is, was it in fact replaced or did the old policy continue to be in effect, in practice? It did. It was not still in practice. You say that. The district court says the opposite. The expert plaintiff said I might agree with you if there were a district judge. Thank God there never was, but the district judge did. The expert plaintiff's expert provided testimony that establishes that none of the providers are currently acting with the requisite state of mind sufficient to find that they were continuing to operate under a policy. There is testimony which may or may not be hearsay and may or may not be admissible, but it quotes a provider as saying, well, we don't do that, meaning we don't provide the kinds of medicines that your new policy say should be available. So the question is, was that an admissible statement or should it have been excluded? If it should have been excluded, what's the consequence? Those statements should have been excluded because there was no opportunity to rebut those statements. Most of them were made from witnesses who were unidentified or that did not have any prescribing privileges. The other point to make is that the two witnesses who the court hinged on, were the decision hinged on, one of them, the statements were made by a provider whom Dr. Morris's attention that there could have been an issue with this particular provider. So it can't be Dr. Morris's fault, is your point? Well, Dr. Morris, that would be effectively a vicarious liability claim, which is not permitted here. The record, again, and as far as the other witness who the district court relied on to make the finding that there was a pervasive failure across multiple docs facilities, was another patient who was-  Are you going to take any time arguing about the fees charged, which you brought up in your 28J letter? You have about a minute left, and attorney's fees for the injunction, the permanent injunction, and damages were given. Are you going to take any time on that? Or are you going to do that in your rebuttal? I can certainly do that now, Your Honor. Our position is that the claims against Dr. Morris were moot, so if we even do get to the question of attorney's fees- There shouldn't be any, but assume we don't agree with you. Well, the issue as to whether or not plaintiffs would be entitled to fees would be whether or not they were a prevailing party. And in order to be a prevailing party, there would have to have been a material alteration in the relationship between the parties, which is our position that the relief that was ultimately obtained by plaintiffs does not alter the relationship between the providers and the patients. Dr. Morris testified that- Right, so your fees argument essentially folds into your preliminary argument. That's correct, yes. Okay, okay. Thank you. Thank you. Thank you. All right. Counsel Feldman. Good morning, Your Honors, and may it please the Court, is this a good level? My name is Brian Feldman. With me today at counsel's table is Amy Jane Agnew. We are counsel for the plaintiff class. Let me start with the question you ended with about fees and the impact of the Supreme Court's recent ruling. What the Supreme Court did was draw a bright-line rule that preliminary relief is not a basis for fees. We are on the other side of that rule. We have final relief. Yeah, so it doesn't have anything to do with this case. It doesn't have any impact in this case. If this case moots out on appeal, it also will not have any impact because it will moot out after the final relief was entered. And Kirk v. New York State Department of Education in the Second Circuit continues to control that question. How would it moot out on appeal? The injunction under the PLRA is set to expire on its own terms by the end of November 2025. So if this court is issuing an opinion, and we submit you don't need to, that everything here is standard and summary order would be fine. But if you do issue an opinion and it takes beyond November, then we'll be in a position where the merits part of this case will be moot on appeal. And Kirk controls that question and says then the fees are therefore affirmed. You'll still get into the fees questions about reductions and the like. But the mootness of the underlying permanent injunction does not take away our right to fees. You say that in any event, the relationship of the parties has been changed fundamentally by the victory that Judge Breska gave you below. Absolutely. This case changed lives for prisoners throughout the state system. As Dr. Moores admitted on the stand and in her declaration, the policy and practice that was in place before this litigation commenced was one in which many patients, and I'm quoting her, were denied the pain treatments they needed. And the district court found through its extensive fact finding that that meant that patients were suffering from debilitating pain while providers were actually aware that they were suffering that pain. What this litigation and the district court's injunctions have done is to change that situation and provide a pathway. Could you talk a little, there's some complexities around the overlapping doctrines here. And you just said the provider's awareness. So how do you understand what is required of Dr. Moore's awareness? So the fact finding was both as to what was going on, which was providers who were not providing these medicines to their patients, and then why, which is the 1983 question. And here it's a simple Monell question, because there in fact was a policy, the MWAP policy from 2017, that the court made factual findings. Can I start you with a very basic question? Why are we talking about Monell with state policy as opposed to a municipality? Because under Will v. Michigan State Department of Police, the Monell test applies. And I believe in this court's case in Reynolds v. Giuliani as well. Reynolds, it does apply. There's no real exploration as to its applicability. We would certainly welcome a decision by the court that it does not apply. I would. Absolutely. But as I say, this case presents no Monell. But you don't need it in this case. We don't need it. The court made three different fact findings. This was over-determined causation here. And just to put a fine point on it, the court did not need to find that Dr. Moore's herself in her personal capacity had culpability. The court had two other findings that it relied on. And this was virtually uncontested. That DOCS at a statewide level implemented its 2017 MWAP policy in order to dampen the medications that include Neurontin, which has a very low abuse potential. And that created a custom statewide that led to all these harms. And that's at 173. The court said that policy in practice is responsible for ongoing violations of federal law because its impacts remain in place. And secondly, yes, Your Honor. Does the injunction require the state to do anything more or different than abide by the new policy that it has created? It originally did, Your Honor. Training and the like, right? There were timelines in there. There were deadlines imposed as well. And those deadlines are at this point expired, right, in large part. There's still a deadline for a new patient who comes in and needs to be coded. But the onerous deadlines that they alleged were onerous back at the stage of talking about this on the preliminary injunction, those have at this point of the appeal passed. And really what we're left with is 1.24a. And the part of 1.24a that they point at as being onerous now is the requirement to screen patients to find out who has neuropathy, who has a chronic pain condition where they may need medication under the policy. Is there anything wrong with a court issuing an injunction that says you have moved from a to b? You say you have moved from a to b, but you haven't. And you must move to a to b, so we order you by injunction to do what you said that you were going to do. Absolutely nothing wrong with that. In this particular case, there was extensive fact-finding that they did not move from a to b. We know that b was put in place as a litigation reaction and that at the time it was put in place, as Judge Preska found, there was no training that was accompanied with the implementation of this. And Dr. Moore testified nobody called the facilities at A38860. And also at A38983, the original author of the original policy, Dr. Dinello, sent out an e-mail telling folks that the policy is gone. We no longer have regional medical director review. This could open the floodgates, and let's not allow our patient population to be enslaved by medications with abuse potential. Well, I mean, that's a legitimate concern. I mean, this is an unusual kind of case because the original policy had praiseworthy, possibly necessary reasons. I mean, otherwise the prisons could be turned into opium dens. So what does the present, what does the injunction allow? How does the present injunction allow the state to avoid having these medicines with adverse potential floating around the premises? Your Honor, the policy which, again, the prison developed, and under Dean v. Coughlin, that's where these policies should come before being placed into an injunction, as this court has said. The policy itself allows for providers to do an individualized assessment. But isn't your position that it may be that the injunction, that the permanent injunction, ought to be modified to take care of Judge Jacobson's concerns? But that's not the issue before us. It's not the issue before us. There's nothing in the record about it. And what is in the record is that the most commonly denied medication was gabapentin, Neurontin. And the only expert who testified, expert Dr. Carinci, said it has exceedingly low abuse potential, in particular in the prison setting. He said in my 20 or 25 years, I've never had somebody try to get this drug. It doesn't get you high. And in the prison setting, it can be administered in liquid form. It's very difficult to divert a drug that's put in your mouth in liquid form. So the thing they're complaining about is the individualized assessment in their briefs. And they said that's too much for a court to do. But that's exactly what this court allowed in Hanbury v. Thompson. There, the question was at Rikers, was Rikers providing education and providing plans for inmates who had disabilities, learning disabilities? And the injunction there that was reviewed by this court and affirmed said that Rikers had to screen the patient population for those who might have a disability and then do an individual evaluation. There's no daylight between Hanbury v. Thompson and individualized assessments in 1.24a, except that the state developed the policy here. And in Hanbury, it was imposed on the state. This is an easier case on the injunction, Your Honors. One other point about the record, clear error is already a high bar. This was the first argument about clear error we've heard. It was not in the briefs. There's a strong presumption, obviously, you're familiar with the standard. I want to talk about the record below. Because what is remarkable, to your point, Judge Jacobs, about possible justifications and to the question of who knew what when, is that there was virtually no defense put on this case. Dr. Moores testified. And I think she did that perhaps out of a misplaced belief that this case was about her, not docs system-wide and as the policy. She testified. No providers took the stand to say, here's why this drug was discontinued. And it was justified. Or I didn't know that Mr. Meary, whose leg had turned black and wanted them amputated, was in severe pain. There was no defense. And so the clear error standard is very easy to apply here. For these reasons, we ask the court respectfully to affirm the judgment and injunction below. Thank you. All right. Counsel Kiley, you have two minutes. Thank you, Your Honor. I think what I would ask the court to focus on is that the evidence presented before the district court was 12 class members who testified. Seven of them were receiving the very medications that they were complaining about. One of them refused to take the medication that they were complaining about. And two out of the 12 had their medications discontinued before the MWOP policy even came to be. So it could not have been because of the MWOP policy. So to say that the record below established an ongoing harm is not correct. Additionally, plaintiffs had to show that the providers were acting pursuant to a policy. And I submit to you that that evidence is lacking. There is no evidence other than these hearsay statements that, even if we take them as true and even if they were admissible, do not even suggest that they were acting pursuant to a policy or even for any non-medical justification. Finally, when the court dismissed the first count against Dr. Moores as being moot, I want to highlight that the second and third prong of the issues at the evidentiary hearing were whether there was any reasonable expectation that the harm could recur and whether 1.24a completely and irrevocably eradicated the effects of MWOP. Those were the three issues at the evidentiary hearing in which the court said that Dr. Moores met her burden. I submit to you that those are exactly the components of irreparable harm which we argue have not been met. Thank you. Thank you, counsel. All right. Take the batter under advisement. It's submitted. We'll hear our last case to be argued, 24-1006. Mirna Visian versus Fuqua College. We're going to get set up on Zoom here. Ms. Mirna Visian, am I saying your name close to correct? Yes. Yes, you are. All right. We have both counsel on Zoom. And Ms. Mirna Visian, you have one minute reserved for rebuttal. You may proceed when you're ready. Okay. Thank you. I am a plaintiff. My name is Stacy Mirna Visian. And I wanted to – I basically set forth factual assertion to support inference of the discrimination case as a cause of my termination. So, number one, several older faculty members who I named in my initial complaint in my department and outside of it were terminated, passed into resignation, or settled with internally. In fact, I'm not aware of any older faculty, 10-year faculty members currently working in business department. Number two, I was replaced by younger, less experienced professor, not a CPA, who taught a reduced course load, mostly online. I could have easily handled those courses given my extensive online teaching experience at Fuqua College, where I taught accounting classes locally in Vietnam and China. And number three, defendants refused to reach accommodation with me until I get the booster, such as making all my classes online or giving me academic leave or sabbatical, which I was entitled to because I have worked for Fuqua College over eight years, and I was 10 years. Instead, they punished me with unpaid suspension, and my letters sent to the management and faculty liaison committee to discuss alternatives were ignored. So, I believe that individually and collectively, these facts go well beyond naked assertions, do void of further factual enhancements, and do allow the court to draw reasonable inference that defendant is liable for misconduct. I have met the standard to survive the motion to dismiss. I stated my health concerns. I took Johnson & Johnson vaccine, which was later recalled due to health considerations to people who have taken it, and there was no booster for the same brand available. Due to those circumstances, I wanted to be examined by a doctor and obtain approval for the booster. However, a scheduled appointment was difficult as doctor's offices were extremely busy during COVID, often requiring a month or more for availability. I informed my division chair about this delay. After meeting with my doctor, I received the booster, but Fuqua College did not reinstate me despite of that. So, my stated concerns received no response. Defendants could have moved my in-person classes online until I obtained the booster or offered alternatives such as health exemption, academic leave, or sabbatical. Instead, defendants used the situation as an opportunity to terminate yet another older employee. In the process, they completely disregarded faculty handbook rules and procedures for discipline and termination of tenured faculty members. Defendants' opposition lacks merit. They argue that I failed to identify accommodation provided to a younger employee that was denied to me. This claim is false. Not only did the defendants replace me with a younger, untensioned, and less experienced professor, but they also assigned him a lighter course load and allowed him to teach most of his and my classes online. This demonstrates that my replacement, a younger professor, received accommodation that I was not offered. It also proves that defendants have the ability to move my classes online, just as they did for my replacement, while allowing me to remain in my position. If Puget College's intent was not to eliminate older faculty, they could have adopted non-discriminatory solutions such as transitioning my classes fully online or free sabbatical. Given that I was already teaching some online classes, shifting to a fully online format would have been seamless. Defendants complain that in my case there is no smoking gun, where a supervisory employee does not make disparaging remarks, in this case about older employees. My cited cases claim that I don't need a smoking gun. In assessing the inferences that may be drawn from the circumstances surrounding intermination of employment, the court must be alert to the fact that employers are wary, so cooperative as to include notation in the personnel file, that their actions were motivated by factors expressively forbidden by law. Because an employer who discriminates is unlikely to leave a smoking gun, attesting to a discriminatory intent, victim of discrimination is seldom able to prove her or his claim by direct evidence and is usually constrained to rely on circumstantial evidence. So, in conclusion, for these reasons, this court should reverse the Northern District of New York decision and deny defendants' motion to dismiss and remand back the case to the Northern District of New York for further proceedings. Okay, thank you. You do have one minute reserved for rebuttal. We'll hear from Counselor McClung. Thank you, Your Honors. May it please the court, my name is Kate McClung from Bond, Schoenig and King. I represent all the appellees except for Dr. Fooster. The standard for an ADEA claim to survive a motion to dismiss is that the employee has to both allege that the employer took adverse action against them and also allege facts that make it plausible that there's an inference of discriminatory intent, that age was the but-for cause of the termination here. And Ms. Mirnachevy simply doesn't allege those facts. The facts that she alleges boil down to, I'm over 40, I was terminated, my replacement was younger, and some other people over 40 also left. That's it. If that's the bar, then pretty much anyone could state a viable age discrimination claim. There's a lot of case law showing that the fact that the replacement is younger is not sufficient to plausibly allege that age was the but-for basis of termination. The fact that other older employees left without any factual context for why they left also gives no inference of age discrimination here. Ms. Mirnachevy talked about accommodations. There is no obligation to accommodate under the ADEA, so it's not a per se violation. She also doesn't allege that any accommodations from the COVID-19 booster policy were given to any younger employees. She talks about the fact that her replacement, who was younger, had a different caseload, but based on the allegations in her complaint, that this facially neutral COVID-19 booster policy applied to all faculty members and all staff unless they exclusively taught online. If the replacement were identical except for the age thing, would that be enough? If the replacement was identical, if she had the same... Except for the age. Right. I mean, if she had been given the exact same course load as her replacement got, she still would have needed to get the COVID-19 booster, she still didn't get the COVID-19 booster, and she still would have been terminated. The difference in courses has nothing to do with it. I was just worried about the Supreme Court's opinion, the Supreme Court just now, that seemed very unhappy about the idea of saying, you need some more background. It's not enough that you're in one category or another. Now, that was in a particular case. I had thought that we always did need more, but... Well, we can debate how much you need, but certainly I think we can all agree that you need something beyond the fact that I'm over 40 and I was terminated, and they replaced me with somebody younger.